UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| BRADFORD T. WHITMORE, as Special | ) | |
| Trustee under the Amended and Restated | ) | |
| Declaration of Trust dated August 12, 1997, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     vs. | ) | |
| | ) | |
| SYMONS INTERNATIONAL GROUP, | ) | 1:09-cv-391-RLY-TAB |
| INC., | ) | |
|     Defendant. | ) | |
| | ) | |
| WILMINGTON TRUST COMPANY, | ) | |
|     Intervenor/Supplemental Defendant. | ) | |
| | ) | |
| CONTINENTAL CASUALTY, | ) | |
|     Intervenor. | ) | |

**ENTRY ON CONTINENTAL CASUALTY COMPANY'S MOTION TO SET
ASIDE JUDGMENT**

Continental Casualty Company ("CCC"), an intervenor in this case, moves to set

aside the July 8, 2009 judgment in favor of Bradford T. Whitmore ("Whitmore"), as

Special Trustee under the Amended and Restated Declaration of Trust dated August 12,

1997 ("Trust").  For the reasons set forth below, CCC's Motion is **GRANTED**.

**I.**    **Background**

    **A.**    **The IGF v. CCC Litigation**

In February 1998, IGF Insurance Company ("IGF"), IGF Holdings, Inc. ("IGFH"),

Symons International Group, Inc. ("SIG") (collectively the "IGF Parties"), and

1

Continental Casualty Company ("CCC"), entered into a Strategic Alliance Agreement ("SAA") whereby IGF acquired the crop insurance business of CCC.  Three years after the purchase of CCC's crop insurance book of business, CCC exercised its right under the SAA for full payment of the purchase price; however, IGF was unable to pay CCC the debt it owed.  Facing severe financial distress, IGF sold its crop insurance business to Acceptance Insurance Companies, Inc. ("Acceptance") on June 6, 2001.  Highly contentious litigation ensued in this court, under Cause No. 1:01-cv-799-RLY-MJD, with multiple claims, counterclaims, and the Symons Family (Gordon, Alan and Doug Symons) and Symons-related entities – Goran Capital, Inc. ("Goran"), SIG, Granite Reinsurance Company, Ltd. ("Granite Re"), Pafco General Insurance Company ("Pafco") and Superior Insurance Company ("Superior") –  added as third-party defendants.

Luckily, for purposes of this case, the court need only address CCC's Amended Counterclaims.  In toto, CCC's Amended Counterclaims alleged that the IGF Parties breached the terms of the SAA (Counts I and II); that IGF fraudulently transferred assets to Goran, SIG, Granite Re, Pafco and Superior (Count IV); and that the Symons Family, and its affiliated companies, SIG, Goran, Granite Re, Pafco, and Superior, should be liable for the contractual liabilities of IGF and IGFH under an alter ego theory (Count V). On March 7, 2007, the court granted CCC's motion for summary judgment on Counts I and II against SIG and IGFH[1] in the amount of $34,258,078, plus interest as of June 1,

_____

[1] IGF was placed into insolvency proceedings by the Indiana Department of Insurance, and CCC settled its claims with IGF prior to the 2007 judgment against SIG.

2006.  (1:01-cv-799-RLY-MJD, Order granting in part CCC's Motion for Summary

Judgment on Their Counterclaims, Docket # 107).

A bench trial on the remaining Amended Counterclaims against Gordon, Alan, and

Doug Symons, and the other Symons-related entities, was held on November 17, 18, 20,

and 21, 2008, and January 8 and 9, 2009.  Following the submission of voluminous

proposed findings of fact and conclusions of law, the court issued its Findings of Fact and

Conclusions of Law on October 19, 2009, finding for CCC on Counts IV and V of the

Amended Counterclaims.  With respect to Count IV, the court found that Acceptance

agreed to pay $40,500,000 as the purchase price for CCC's and IGF's crop businesses;

yet $9,000,000 of the purchase price was diverted to SIG and Goran, and $15,000,000 of

the purchase price was diverted to Granite Re.  SIG then transferred the $4,500,000 it

improperly received to related companies Pafco and Superior.  The court found that the

$24,000,000 which was fraudulently transferred to SIG, Goran, Granite Re, Pafco and

Superior was actually purchase price consideration that should have been paid to IGF, and

thus, should have been available to satisfy its debt to CCC.  The court also found that

SIG, Goran, Granite Re, IGF, IGFH, Pafco and Superior were alter egos of one another,

and of Gordon, Alan and Doug Symons, that the Symons Family used their control over

the Symons-related entities to avoid satisfying the outstanding debt to CCC, and that it

was appropriate to pierce the corporate veil and make all the Symons defendants jointly

liable to CCC with SIG and IGFH.  (1:01-cv-799-RLY-MJD, Findings of Fact and

Conclusions of Law, Docket # 257[2]).

The final judgment, issued on October 19, 2009, was vacated on June 15, 2010, while the case was on appeal, due to concerns over the finality of the judgment.  To date, CCC does not have a final judgment in the case.

## B.     The SIG Capital Trust

On August 27, 1997, SIG created a wholly-owned Delaware business trust, named SIG Capital Trust I ("Trust"), pursuant to an Amended and Restated Declaration of Trust ("Trust Agreement") between SIG and the trustees, as a means to raise capital for SIG. The Trust issued and sold to the public $135,000,000 in preferred securities, the proceeds of which were used by the Trust to purchase unsecured Senior Subordinated Notes issued by SIG, pursuant to the Senior Subordinated Indenture ("Indenture") between SIG and the Wilmington Trust Company ("WTC"), an intervenor in this case, dated August 12, 1997. The Notes were in the principal amount of $135,000,000 payable in 30 years, and bore interest of 9 ½ % per year.  (*See* Indenture, Ex. A to Wilmington Trust Company's Motion to Intervene ("Indenture"), Docket # 25).  Pursuant to the Trust Agreement, the Trust was obligated to make two interest payments a year – one on February 15 and one on August 15 – with the first accruing on February 15, 2005.  (*See* Trust Agreement, Ex. A to Complaint ("Trust Agreement"), § 4.1, Docket # 1).  The Trust never made an interest payment to the preferred shareholders, because SIG never met its payment

_____

[2] The evidence cited in this Entry is taken from CCC's Reply (Docket # 123) and Whitmore's Response (Docket # 81).  For ease of reference, evidence taken from other court filings from this Cause, and Cause No. 1:01-cv-799-RLY-MJD,  will include the docket number.

obligations to the Trust; thus, SIG has been in default since March 15, 2005.  (*See*

Indenture § 5.1, Docket # 25) (stating that an "event of default" occurs in the payment of

monies owed to the owners of the preferred securities thirty (30) days past the date on

which SIG failed to make a required interest payment).

Gordon Symons and Goran, through its wholly-owned subsidiaries Granite Re and

Granite Insurance Company, own more than 50% of the preferred securities.  (*Id*. at 12-

18; Deposition of Christopher Rogowski ("Rogowski Dep.") at 44-45; CCC Ex. 7).

Incidentally, Goran also owns 73% of SIG.  (1:01-cv-799-RLY-MJD, Deposition of Alan

Symons at 16-17, Docket # 51).  As discussed below, another large holder of preferred

securities issued by the Trust is Whitmore.

### C.    Whitmore

Whitmore is one of two general partners of Grace Bros. Ltd. ("Grace"), a limited

partnership that invests in debt or equity securities of both public and private companies.

(Affidavit of Bradley Whitmore ("Whitmore Aff.") ¶ 2).  In May 2000, Grace purchased

preferred securities, at a heavy discount from the Trust, having a par value of

$37,555,000.  (Deposition of Bradley Whitmore ("Whitmore Dep." at 23-25; Whitmore

Aff. ¶ 6).  Over three years later, Whitmore purchased the same securities from Grace for

$93,887.50 – a  99.88% discount off the principal amount – so that Grace could recognize

a capital loss on its tax return.  (Whitmore Dep. at 30; CCC's Ex. 5; *but see* Whitmore

Aff. ¶ 7 (stating that the securities were transferred into his individual name for tax

purposes).

### D.     Communication Between SIG and Whitmore

Whitmore and Christopher Rogowski ("Rogowski"), a Grace financial analyst, were aware of IGF's issues with CCC even before the IGF/CCC litigation commenced in June 2001.  (*See* CCC Ex. 10; Rogowski Dep. at 28).  Rogowski testified that Grace was "concerned" about the litigation, so he and Whitmore received periodic updates on the status of the litigation.  (Rogowski Dep. at 28; CCC Exs. 11, 12, 13, 15).  On May 6, 2008, Doug Symons (hereinafter "Symons") advised Rogowski that CCC "got a judgment of $35MM on [sic] put obligation of IGF against Symons," [referring to the court's grant of summary judgment on CCC's Amended Counterclaims for breach of contract] and that the trial date was May 2009.  (CCC Ex. 18 at 482).  The parties discussed whether a judgment in favor of CCC would have priority over the preferred securities issued by the Trust.  (*Id.*) ("Question – would C[CC] judgment be senior to Trust Preferreds?").  Rogowski's notes further state:

> Improve seniority of trust preferred.  If we worked together and did not want to be patient[,] SIG would trade trust preferred asset for senior secured asset.  Perfected far enough in advance.  Insider transaction period is one year.

(*Id.*; *see also* Rogowski Dep. at 83-84).

On August 25, 2008, Rogowski was informed that the trial date was moved to November 17, 2008.  (CCC's Ex. 18 at 484).  He and Symons discussed "what needs to be done if partial judgment [the 2007 summary judgment] becomes final" and raised the question: "Trust preferred: should they make more noise and ask SIG to do something to

perfect the claim better than anyone?"  (*Id.*; *see also*, Rogowski Dep. at 86).

On October 30, 2008, approximately two weeks before the IGF/CCC trial was set to begin, Rogowski and Symons changed course: they decided to pursue a judgment lien. Rogowski's email to Symons reads: "I have been trying to contact you.  We would like to move forward in fully understanding this judgment lien issue."  (CCC Ex. 8; Rogowski Dep. at 96).  On that same day, Whitmore followed with an email to Symons and Rogowski: "I really believe that we, as bondholders, need to asset [sic] a claim on account of our debt (principal and interest), and get a judgment on that amount. . . . I want to take action sooner than later."  (CCC Ex. 8).

### E.    Whitmore Decides to File a Lawsuit Against SIG

In mid-November 2008, shortly before the IGF/CCC trial, Whitmore retained the law firm of McFadden & Dillon to file a lawsuit against SIG based on SIG's March 2005 default with respect to the Trust's interest obligations to the preferred shareholders. (Affidavit of Thomas J. Dillon ("Dillon Aff.") ¶¶ 5, 10).  Whitmore received at least one email update on the trial proceedings and he ordered a copy of the trial transcript.  (CCC Exs. 19-20).  In December 2008, Whitmore's lawyer, Thomas J. Dillon ("Dillon"), emailed Symons wanting to know "when [Symons] and the company's former attorneys are available to follow up on information needed to ascertain and protect the interests of the security holders."  (CCC Ex. 21).

Symons arranged a telephone call between Dillon and SIG's former Associate General Counsel, Brenda Armstrong ("Armstrong").  (Symons Dep. at 66; *see also* 1:01-

cv-799-RLY-TAB, Trial Transcript at 669-70,[3] Docket # 241).  Armstrong provided

Dillon copies of the Indenture and various trust documents that Whitmore wanted.  (CCC

Exs. 22, 23, 24).  On January 14, 2009, Symons notified Dillon that WTC was "putting

together a proposal for us and costs to handle claim," and noted that WTC needed to be

paid on an overdue $35,000 bill "before they can handle next step."  (CCC Exs. 25, 26).

Having not heard from WTC for more than three weeks, Dillon informed Armstrong,

"Unless it appears that WTC is going to be quickly on board, I suggest we pursue the

special trustee option as soon as possible."  (CCC Ex. 28).  After several more email

communications between Armstrong, Symons, and Dillon, (*see* CCC Exs. 27-28), on

March 3, 2009, WTC informed Dillon that WTC was willing to file suit against SIG on

behalf of the Trust if it was paid its outstanding trustee and attorney fees of $85,000, plus

a $25,000 retainer.  (Symons Dep. at 62-63; CCC Ex. 24).  Dillon inquired of Armstrong,

"[W]ho will pay this amount?  As an alternative, do we need WTC?"  (CCC Ex. 24).

Ultimately, Whitmore was unwilling to advance the money to the Trust, and rejected

WTC's offer to initiate a lawsuit on behalf of the trust.  (Whitmore Dep. at 74; Dillon Aff.

¶ 29; Symons Dep. at 63).

On March 11, 2009, Dillon asked Armstrong to "confirm that a notice of default

was sent for nonpayment of principal and interest on the Notes."  (CCC Ex. 31).

---

[3] On November 21, 2008, Armstrong testified in the IGF/CCC bench trial.  She testified, *inter alia*, that she was employed as Associate General Counsel for SIG, and, since going into private practice, she has performed legal work for Goran, Granite Re, Superior Insurance Company, and Superior Insurance Group, Inc. (1:01-cv-799-RLY-TAB, Trial Transcript at 669-70, Docket # 241).

Armstrong obtained three notices from WTC and forwarded them to Dillon.  The three notices were issued in 2004, before SIG defaulted on the interest payment; none of the notices discussed a payment default.  (CCC Ex. 32).  In addition, Symons obtained a "participant contact list" from WTC, which reflected the holders of the preferred securities by "street name," but not by the name of the beneficial owner.  (CCC Exs. 33, 34; Symons Dep. at 18-19).

On March 20, 2009, Armstrong calculated the amount of "outstanding obligations" on the preferred securities, and forwarded them to Dillon.  (CCC Ex. 36).  Eight days later, Armstrong emailed Dillon, "as a follow up to [Symons'] question and [their] conversation," informing Dillon that there may be a problem with Whitmore proceeding as Special Trustee.  In her opinion, the Trust Agreement provided that only "holders" of at least 25% of the preferred securities could appoint a Special Trustee, and it was not clear whether Whitmore, a "beneficial owner" of preferred securities, was a "holder" as defined by Delaware trust law.  (CCC Ex. 37).  Armstrong suggested that Whitmore "identify his broker on the WTC list and have that broker appoint him as special trustee." (*Id*.).  Interestingly, Whitmore seems to have not seriously considered the option of bringing a direct action in his individual capacity against SIG for non-payment of the Notes.  (*See* Indenture § 5.8, Docket # 25) ("The Company and the Trustee acknowledge that pursuant to the Declaration, the Holders of Preferred Securities are entitled, in the circumstances and subject to the limitations set forth therein, to commence a direct action with respect to any Event of Default under this Indenture and the Securities"); *see also id*.

§ 1.11 ("[I]f an Event of Default has occurred and is continuing and such event is attributable to the failure of the Company to pay principal or . . . interest on the Securities when due, the Company acknowledges that a holder of Trust Securities may directly institute a proceeding for enforcement of payment to such holder . . . ."); *see also* Trust Agreement § 6.1(b), Docket #1 ("Holders of Preferred Securities shall not be able to exercise directly any other remedies available to the holder of the Notes unless the Preferred Trustee or the [Special] Trustee, acting for the benefit of the Preferred Trustee, fail to do so.  In such event, Holders of at least 25% in Liquidation Amount of all Outstanding Preferred Securities shall, to the fullest extent permitted by law, have a right to institute such proceedings.").  Although the cited sections of the Indenture provide that only "holders" may bring a direct action, Dillon apparently believed that Whitmore met that definition; otherwise, he would not have advised Whitmore to file the lawsuit as Special Trustee.

On March 23, 2009, Dillon prepared a direction, signed by Whitmore, to WTC as Preferred Trustee, to accelerate the principal balance due.  (Dillon Aff. ¶ 34; Dillon Aff., Ex. 6).  The direction did not follow the requirements of Section 5.2 of the Indenture, the only provision for acceleration of payment of principal, and was never delivered to anyone.  (*See* Dillon Aff. ¶ 34 ("In the event Mr. Whitmore's effort to collect the entire principal balance of the Notes was challenged[,] I intended, if necessary, to utilize that direction to resolve that issue.")).

### F.     The Whitmore/SIG Litigation

On March 30, 2009, Whitmore filed the present lawsuit in his capacity as Special

Trustee under the 1997 Trust Agreement – four years after SIG's default on the interest

payments owed to the preferred shareholders.  The Complaint, nine paragraphs in length,

declared that the holders of the outstanding preferred securities were due $135,000,000 in

principal and $206,518,631.28 in interest.  (Complaint, ¶ 9, Docket # 1).  The Complaint

is silent on a number of salient points, including why Whitmore, on behalf of the Trust,

was entitled to the $135,000,000 in principal, or the accelerated interest, or why it took

four years to file the Complaint.  Moreover, the Complaint failed to allege how Whitmore

met the preconditions for filing suit as a Special Trustee that are established in the

Indenture, including, but not limited to, serving notice to the Trustee of a continuing

event of default, offering a reasonable indemnity to the Trustee for bringing the suit, and

the refusal of the Trustee to file a suit.  (Indenture § 5.7, Docket # 25).  Most importantly,

the Complaint filed to mention that affiliates of SIG owned a majority of the preferred

securities on whose behalf Whitmore was purportedly bringing the derivative action.

On May 7, 2009, Patrick J. Dietrick, of the law firm Collignon & Dietrick, filed his

appearance on behalf of SIG.  (Notice of Appearance, Docket # 8).  On that same day,

SIG filed its Answer, and admitted all nine allegations of the Complaint.  (Answer,

Docket # 10).  Significantly, SIG failed to assert any defenses, including the standard

defenses of statute of limitations (on the claim for interest), standing, and ripeness (on the

claim for principal).  In addition, SIG failed to assert any defenses under the terms of the

Trust documents, despite the fact that neither Whitmore nor WTC ever took any action

with respect to the default until Whitmore filed suit in March 2009.  (Whitmore Dep. at

51).  Further, as explained above, SIG failed to challenge Whitmore's ability to pursue

the present lawsuit as Special Trustee.  Indeed, WTC advised Whitmore that Section 5.7

of the Indenture most likely barred Whitmore from bringing suit "as a self-appointed

'Special Trustee.'"  (CCC Ex. 38 ("In light of the foregoing, it would be inappropriate

and improper for Mr. Whitmore to take the proposed course of action suggested in your

letter at this time without further consultation with the Trustee"); *but see* WTC's

Response to CCC's Motion to Set Aside at 2 ("[WTC] agreed with Whitmore's plan to

bring an action against SIG, on behalf of all security holders . . . .").

On May 11, 2009, four days after SIG filed its Answer, Armstrong sent Dillon an

email informing him that SIG would re-calculate the interest on the Notes, as well as the

accelerated principal.  (Symons Dep. at 74; CCC Ex. 39).  She also asked, "Would it be

possible to file your motion prior to the pretrial conference to expedite a ruling?"  (CCC

Ex. 39).  Whitmore then served a single Request to Admit, based on SIG's volunteered

calculation, which stated:

> The amount due and owing as of June 1, 2009 to Bradford T. Whitmore as
> Special Trustee under a certain Amended and Restated Declaration of Trust
> Dated August 12, 1997 on behalf of the Holders of Outstanding Preferred
> Securities is the sum of $316,039,570.31, consisting of $135,000,000.00 in
> principal and $181,039,570.31 [in] accrued and unpaid interest.

(Whitmore's Motion for Judgment on the Pleadings, Ex. 3, Docket # 19).  On June 15,

2009, SIG responded, "Admitted."  (*Id*).  Two days later, on June 17, 2009, Whitmore

filed a Motion for Judgment on the Pleadings, without a supporting brief as required by Local Rule 7.1(a).  On the very same day, SIG filed its Notice of No Response to the Motion for Judgment on the Pleadings.

On June 22, 2009, WTC moved to intervene in the action, stating that, pursuant to Section 8.13 of the Trust Agreement and Article V of the Indenture, it had an obligation as trustee to collect and distribute the proceeds of any recovery.  Judge Stinson granted WTC's Motion two days later.

On July 8, 2009, Judge Stinson entered judgment in favor of Whitmore and against SIG in the full amount sought of $316,039,570.31, plus costs.

Whitmore filed a motion for proceedings supplemental on August 21, 2009.  In marked contrast to its vigorous defense in the IGF/CCC litigation, SIG filed a Notice of Compliance in the Whitmore case three weeks later.

### G.    CCC Intervenes

CCC learned of this litigation approximately three or four months after the July 8, 2009 judgment.  Although it is not clear exactly how it came upon this information, it appears it was due to the fact that Whitmore and CCC were attempting to execute on the same SIG-related property at roughly the same time.  (*See e.g.*, CCC's Motion to Intervene, Docket # 49).  At any rate, CCC moved to intervene on November 25, 2009, and the court granted the motion on September 14, 2010.  On September 28, 2010, CCC filed the present motion to set aside.  The briefing was stayed to allow CCC time to conduct limited discovery relevant to its motion, and thus, CCC's motion was not fully

briefed until December 5, 2011.

Ironically, Whitmore purchased additional preferred securities from the Trust with a par value of $14,000,000 for $18,200, on November 30, 2010.

## II.    Discussion

CCC argues that the final judgment in favor of Whitmore and against SIG must be set aside for three principal reasons: (1) the judgment constitutes a fraud on the court under Rule 60(d)(3); (2) the judgment constituted a fraudulent transfer under Sections 14 and 15 of the Indiana Fraudulent Transfer Act; and (3) allowing the judgment to stand would be unjust and inequitable to CCC under the "catchall" provision of Rule 60(b)(6). CCC, as an intervenor, has standing to challenge the judgment because it has a significant, prior interest in the same res at issue in the Whitmore judgment – *i.e.*, SIG's assets. *See Cuthill v. Ortman-Miller Mach. Co.*, 216 F.2d 336, 338-39 (7th Cir. 1954) (holding that stockholder could intervene to challenge a judgment where his interests were adversely affected by the judgment); *see also Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 188 (2d Cir. 2006) (holding that a non-party may challenge a judgment where the non-party's interests are "strongly affected") (quoting *In re Lawrence*, 293 F.3d 615, 627 n.11 (2d Cir. 2002)).

Rule 60 of the Federal Rules of Civil Procedure "regulates the procedure for obtaining relief from final judgments." *Arrieta v. Battaglia*, 461 F.3d 861, 864 (7th Cir. 2006) (citing *Wesco Prods. Co. v. Alloy Auto. Co.*, 880 F.2d 981, 983 (7th Cir. 1989)). Relief from judgment "'is an extraordinary remedy and is granted only in exceptional

14

circumstances.'"  *Wickens v. Shell Oil Co.*, 620 F.3d 747, 759 (7th Cir. 2010) (quoting

*Dickerson v. Board of Educ.*, 32 F.3d 1114, 1116 (7th Cir. 1994)).  The decision whether

to grant or deny a motion to set aside judgment is within the sound discretion of the district

court, and will be reversed only if "'no reasonable person could agree with the district

court.'"  *Reinsurance Co. of Am., Inc. v. Administratia Asigurarilor de Stat*, 902 F.2d

1275, 1277 (7th Cir. 1990) (quoting *McKnight v. United States Steel Corp.*, 726 F.2d 333,

335 (7th Cir. 1984)).

Rule 60 provides for relief from judgment for, *inter alia*, fraud on an opposing

party (Rule 60(b)(3)) and fraud on the court (Rule 60(d)(3)).  Because CCC's motion to set

aside was filed more than one year after the entry of judgment, CCC may proceed only

under Rule 60(d)(3).  *In re Golf*, 652 F.3d 806, 809 (7th Cir. 2011) (stating that because

fraud on the court is that type of fraud that "ordinarily couldn't be discovered, despite

diligent inquiry, within a year," one bringing a claim for fraud on the court is not bound by

Rule 60(b)(3)'s one-year time limitation); *see also Arrieta*, 461 F.3d at 864 (holding that

the one-year time limitation for bringing a motion for relief from judgment under Rule

60(b)(1)-(b)(3) "is jurisdictional and cannot be extended").

"Fraud on the court" refers to "conduct that might be thought to corrupt the judicial

process itself, as where a party bribes a judge or inserts bogus documents into the record."

*Oxxford Clothes XX, Inc. v. Expeditors Int'l of Washington, Inc.*, 127 F.3d 574, 578 (7th

Cir. 1997); *see also In re Golf*, 652 F.3d at 809 (defining "fraud on the court" as "that

species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated

15

by officers of the court [i.e., lawyers] so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases"). "Fraud on the court" is defined narrowly to prevent it from being used as "an open sesame to collateral attacks, unlimited as to the time within which they can be made by virtue of the express provision in Rule 60(b) [now Rule 60(d)] on this matter, on civil judgments." *Oxxford Clothes*, 127 F.3d at 578. A party seeking to set aside a judgment under either Rule 60(b)(3) or Rule 60(d)(3) must prove fraud by clear and convincing evidence. *Wickens*, 620 F.3d at 759 (citations omitted).

Whitmore's concern over the court's ruling granting partial summary judgment in favor of CCC and against the IGF Parties in the amount of $34,258,078, plus prejudgment interest, on CCC's Amended Counterclaims for breach of contract is understandable. A prudent investor would be concerned over a large judgment that would, in all likelihood, negatively impact the value of a large investment. As the trial date grew near on Counts IV and V of CCC's Amended Counterclaims, the threat of a judgment against the Symons-related entities, including SIG, turned Whitmore's concern into a plan to ensure that the Trust preferred securities, more than 25% of which were owned by Whitmore and more than 53% were owned by Symons affiliates, took a priority interest over any judgment in favor of CCC. The court's finding is supported by the email traffic and contemporaneous notes of telephone conversations between Symons and Rogowski, and by Whitmore's own testimony. (*See* Whitmore Aff. ¶ 14 (testifying that "his concern about the expedited resolution of [his] claim was fueled, in part, by [his] knowledge" of CCC's claims in this

16

court).  The court's finding is further supported by the absence of any evidence from this

time period indicating that Whitmore ever considered bringing a direct action to recover

the interest due him by SIG.

Whitmore's and Symons' common goal of attaining a priority interest over CCC's

yet-to-be judgment is most evident from reading the email communications between

Armstrong and Dillon.  Symons asked Armstrong to participate in a telephone call with

Dillon to answer questions posed by Dillon that Symons could not answer regarding the

Trust.  The timing of this telephone conversation is worth noting.  It occurred after

Armstrong testified in the IGF/CCC trial in November 2008, but before the trial

proceedings had concluded in January 2009.  (Symons Dep. at 65-66) (referring to an

email communication dated December 17, 2008, sent by Dillon to Symons, which

precipitated the telephone conversation between Dillon and Armstrong).

At any rate, Armstrong did more than just answer questions posed by Dillon.  She

provided Dillon with copies of the Indenture and other Trust documents; furnished Dillon

with notices of default that she acquired from WTC (that ultimately had nothing to do with

this litigation); contacted (along with Symons) WTC to see if WTC would be willing to

file a lawsuit on behalf of the Trust against SIG; and calculated the amount of the Trust's

outstanding obligations to the preferred shareholders.  Moreover, Armstrong reviewed the

Indenture and Trust, and gave her legal opinion on whether Whitmore could serve as a

self-appointed Special Trustee.  She ended her email communication by concluding that a

"practical solution" for Whitmore would be to have his broker appoint him as Special

Trustee.

The communications between Armstrong and Dillon continued even after Whitmore filed the present lawsuit, and SIG hired the law firm of Collignon & Dietrick. In fact, Armstrong offered to re-calculate the interest owed on the preferred securities, and *encouraged* Dillon to *expedite* the filing of its "motion" – i.e., its motion for judgment on the pleadings – before the parties' pre-trial conference. The need for a quick judgment is obvious – by this time, the IGF/CCC trial had concluded, but the court had not yet issued, its Findings of Fact, Conclusions of Law, and Judgment.

The court proceedings are also reflective of a non-adversarial, complicit relationship between plaintiff and defendant. SIG admitted everything – the allegations of the Complaint and Whitmore's request to admit only one fact – damages. SIG raised no defenses, even though there were a multitude of defenses that it could have raised, the most obvious of which is Whitmore's capacity to bring the suit as self-appointed Special Trustee, and the statute of limitations. SIG did not even raise an eyebrow at Whitmore's request for the acceleration of principal and interest on the 30-year Notes, the preconditions of which were not met. The case proceeded in an expedited fashion through the court, with Whitmore's Motion for Judgment on the Pleadings and SIG's Notice of No Response filed on the very same day. Even more troubling, and what the court considers an affront to the administration of justice, is the fact that neither Whitmore nor SIG ever informed Judge Stinson that SIG affiliates owned a large block of preferred securities, such that any recovery for Whitmore was a winning proposition for SIG's affiliates.

18

Whitmore contends that CCC is not prejudiced by the judgment because, once Whitmore and WTC collect on SIG's assets, CCC may seek an order against WTC to prevent it from distributing any amounts owed by the Trust to the preferred shareholders affiliated with the Symons Family or its affiliates.  This court is not persuaded by Whitmore's argument.  CCC has been prejudiced by having to intervene in this action, the sole purpose of which is to delay and thwart CCC's ability to collect on SIG's assets.

Viewing the evidence in its totality, the court finds this case fits within the narrow definition of a fraud on the court.  The parties' "collusive" activity perpetrated a fraud on the judicial machinery itself, by fostering an appearance that the litigation involved adverse parties, when, in fact, it did not.  Moreover, this is not the type of fraud that could ordinarily have been discovered through diligent inquiry.  The full extent of the fraud only came to light after the court granted CCC limited discovery.

The court need not address the other grounds raised by CCC in support of its motion.  CCC's Motion to Set Aside Judgment is **GRANTED**.

## III.    Conclusion

The court finds that CCC has proven, by clear and convincing evidence, that Whitmore's judgment was a product of fraud on the court.  Accordingly, CCC's  Motion

to Set Aside Judgment (Docket # 75) is **GRANTED**.  The Court directs the Clerk to

reopen the case.


**SO ORDERED** this  30th   day of March 2012.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

James A. Hardgrove
SIDLEY AUSTIN BROWN & WOOD LLP
jhardgrove@sidley.com

Patricia M. Petrowski
SIDLEY AUSTIN LLP
ppetrowski@sidley.com

Michael  Rabinowitch
WOODEN & MCLAUGHLIN LLP
mrabinowitch@woodmclaw.com

Ellen S. Robbins
SIDLEY AUSTIN LLP
erobbins@sidley.com

Kevin M. Fitzgerald
NIXON PEABODY LLP
kfitzgerald@nixonpeabody.com

Michael H. Michmerhuizen
BARRETT & McNAGNY LLP
mhm@barrettlaw.com

Mary F. Schmid
STEWART & IRWIN, P.C.
mschmid@silegal.com

Edward Paul Grimmer
AUSTGEN KULPER & ASSOCIATES, P.C.
egrimmer@austenlaw.com

Thomas J. Dillon
McFADDEN & DILLON, P.C.
t.dillon@mcdillaw.com

W. Daniel Deane
NIXON PEABODY LLP
ddeane@nixonpeabody.com

Marc A. Menkveld
STEWARD & IRWIN P.C.
mmenkveld@silegal.com

Thomas D. Collignon
COLLIGNON & DIETRICK
tcollignon@cdattorneys.com

Patrick J. Dietrick
COLLIGNON & DIETRICK
pdietrick@cdattorneys.com

Copy to:

Dale R. Crider
CNA Center
222 S. Wabash Ave., 43rd Fl.
Chicago, IL 60604